1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| GERALD BRENT HARRIS, | Case No. 1:19-cv-01203-NONE-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING EVIDENTIARY HEARING ON INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM FOR FAILURE TO FILE NOTICE OF APPEAL AND DENIAL OF REMAINING CLAIMS OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| SCOTT FRAUENHEIM, | |
| Respondent. | |

12

13

14

15

16

17

18

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19

pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

20

21

On September 4, 2014, Petitioner was convicted after a jury trial in the Kern County

22

Superior Court of second-degree murder. The jury also found true the special allegations that

23

Petitioner personally discharged a firearm causing death. (2 CT[1] 394–95, 406). The trial court

24

sentenced Petitioner to an indeterminate term of fifteen years to life for second-degree murder

25

plus twenty-five years to life for the personal gun use enhancement. (2 CT 406; 7 RT[2] 1550). On

26

March 28, 2018, the California Court of Appeal, Fifth Appellate District ordered that the

27

28

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on April 15, 2021. (ECF No. 26).
[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on April 15, 2021. (ECF No. 26).

1    sentence be "vacated and the case remanded for the trial court to exercise its discretion whether
2    to impose or to strike the gun use enhancement pursuant to section 12022.53 as amended [by
3    Senate Bill No. 620]." People v. Harris, No. F070236, 2018 WL 1516967, at *10 (Cal. Ct. App.
4    Mar. 28, 2018). The judgment was otherwise affirmed. Id. The California Supreme Court denied
5    Petitioner's petition for review on June 13, 2018. (LD[3] 19). On November 1, 2018, the trial court
6    re-imposed the same sentence of fifteen years to life for second-degree murder plus twenty-five
7    years to life for the personal gun use enhancement. (LD 20).

8         On September 3, 2019, Petitioner filed the instant federal petition for writ of habeas
9    corpus. (ECF No. 1). As various claims were pending in a collateral challenge in the California
10   Court of Appeal, this Court stayed the petition on January 6, 2020 so that Petitioner could
11   exhaust his state remedies. (ECF No. 10). On November 7, 2019, the California Court of Appeal,
12   Fifth Appellate District denied Petitioner's state habeas petition without prejudice for failing to
13   first file a petition in the Kern County Superior Court and for failing to include copies of
14   reasonably available documentary evidence supporting Petitioner's claims. (LD 21). On
15   February 17, 2021, the California Supreme Court summarily denied Petitioner's state habeas
16   petition that was filed on July 23, 2020. (LD 22). That same day, the California Supreme Court
17   also denied Petitioner's subsequent state habeas petition that was filed on September 21, 2020,
18   with citation to In re Miller, 17 Cal.2d 734, 735 (1941), noting that "courts will not entertain
19   habeas corpus claims that are repetitive." (LD 23). On March 1, 2021, this Court lifted the stay in
20   this matter. (ECF No. 24).

21        In the petition, Petitioner raises the following claims for relief: (1) instructional errors; (2)
22   ineffective assistance of trial and appellate counsel; (3) erroneous admission of prejudicial
23   evidence; and (4) abuse of discretion regarding Petitioner's sentence. (ECF No. 1 at 4–7, 12).[4]
24   On April 26, 2021, Respondent filed an answer. (ECF No. 27). On July 2, 2021, Petitioner filed a
25   traverse. (ECF No. 33).

26   ///

27
28   [3] "LD" refers to the documents lodged by Respondent on April 15, 2021. (ECF No. 26).
     [4] Page numbers refer to the ECF page numbers stamped at the top of the page.

1

## II.

2

## STATEMENT OF FACTS[5]

3

Isaac Foreman grew up knowing Dante Breeding and was close enough to him to refer to Breeding as his cousin. Foreman's girlfriend, Jasmine Wilemon, lived next door to defendant, introduced Foreman to defendant's wife (Kim), and subsequently introduced Foreman to defendant. Foreman was living with Jasmine Wilemon and would see defendant once or twice a day.

4

5

6

About two or three months before the shooting, Foreman was in the front yard of defendant's home when Breeding showed up. Foreman had not known Breeding knew Kim, but Breeding told Foreman that Kim was a friend. Foreman frequently saw Breeding at defendant's residence. Foreman explained Breeding would "hang out" with both Kim and defendant. According to Foreman, Breeding was at defendant's house on a regular basis, three times a day—morning, afternoon, and at night. Other neighbors, including Jasmine Wilemon, also observed Breeding's regular visits to defendant's house. Breeding was frequently at defendant's house late in the afternoon or late at night.

7

8

9

10

11

Defendant worked the graveyard shift as a United States Postal Service employee. During the two-month period leading up to the shooting, Foreman believed Breeding was at defendant's house every night while defendant was at work. Breeding was not living at defendant's house; he lived with his wife. Foreman believed his cousin and Kim were having a sexual relationship. A month after Breeding first started frequenting defendant's house, Foreman observed Breeding and Kim smoking cigarettes in the garage. He saw Kim approach Breeding, who was sitting on the washing machine, and kiss him on the lips.

12

13

14

15

16

Three weeks before the shooting, defendant came home from his job at 3:00 a.m. to get some medication. Defendant found Breeding and Kim in the computer room with the lights off. Defendant told Breeding he no longer wanted him to come to the house. The following day, as Foreman was mowing defendant's lawn, defendant told Foreman, "[I]f I see your cousin over here, I'm going to shoot him." Foreman explained that about two-months before the shooting, defendant stated "if he caught anyone [effing] with his girl, he will shoot him."

17

18

19

20

Foreman said Kim had shown him a shotgun. But in a statement made to a law enforcement officer, Foreman had said it was defendant who showed him the shotgun while telling Foreman he would kill anyone having sex with his wife. Adrian Wilemon, Jasmine Wilemon's brother, also lived next door to defendant's home. Adrian explained defendant had shown him his shotgun. A couple of weeks before the shooting, Adrian heard defendant say if he found someone with his wife he would kill the person, and he shoots to kill. About a month before the shooting, defendant told Adrian he had come home from work one evening and found Breeding and Kim together in the computer room. Defendant did not make further negative comments to Adrian about Breeding. Adrian did not recall defendant saying of Breeding that he "never liked that nigger." But Adrian told an investigator defendant had made a remark of that nature.

21

22

23

24

25

26

27

28

---

[5] The Court relies on the California Court of Appeal's March 28, 2018 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

Either the night before the shooting, or possibly two nights before, Jasmine Wilemon and Foreman played a prank on defendant by taking condoms out of their wrappers and placing them on the doorknob of his house and inside defendant's car. Foreman denied personally participating in this prank, but said he watched Jasmine place condoms on the steering wheel and antenna of defendant's car. Although a deputy investigating the scene did not find condoms or condom wrappers in the car or at the front door, a condom wrapper was found on the concrete walkway north of the driveway. Foreman identified the wrapper as one from the prank.

A day after the prank, Jasmine Wilemon worried defendant would believe Breeding had placed the condoms at the house, because she knew Breeding and Kim were "messing around" and thought defendant would think Breeding did this as a joke on defendant. After the shooting, Jasmine was concerned the prank could have fueled defendant's worry over his wife's relationship with Breeding.

Jasmine Wilemon spoke to defendant on the phone about a condom wrapper a deputy had found in the garage. Defendant told her not to worry because she had nothing to do with anything. In a recorded call from the jail, defendant told Kim he thought Breeding had opened up the garage door to shed light on the condoms that were on his car. During this call, Kim told defendant, "I thought you were upset about the fucking rubbers everywhere." Defendant replied: "I was cause I thought whoever did it was [Breeding] and I said I wanted to be alone with you that night. That same time I tell you—tell him that I wanted to be alone with you, he goes and does all this stuff."

The evening before the shooting, a neighbor heard a male and female arguing at defendant's house. Then, the morning of June 5, Foreman overheard an argument between defendant and Breeding. Kim had allowed Breeding to shower at the Harris house. Defendant told Breeding he did not want him in the house. According to Foreman, defendant "was upset that my cousin kept coming around after he told him not to." Foreman had initially told a law enforcement officer he thought the argument was about Kim's sexual relationship with Breeding.

Foreman testified Kim was driving him and Jasmine Wilemon to the store in defendant's vehicle in late afternoon of June 5 when they saw Breeding. Kim pulled over to talk with him, and she told him to come to her house. They drove back to the Harris house. Breeding and Kim walked inside the house, and Foreman and Jasmine went to Jasmine's house. Foreman and Jasmine heard a gunshot about 10 minutes later. Foreman testified that "during or around" the time of the shotgun blast, he heard defendant yelling and "going crazy."

Jasmine Wilemon's testimony differed from Foreman's testimony concerning the events immediately before the shooting. She did not remember going to the store with Kim and Foreman. Jasmine explained she had arrived home from an appointment when she, Foreman, and her brother saw Breeding drive up to the Harris house. Jasmine added, "We seen that [Breeding] was kind of upset about something. We didn't know what, though, and then me and [Foreman] seen him walking up [defendant]'s driveway to the garage, and shortly after that, that's when they said they heard the gunshot."

Deputy Benjamin Pallares questioned Kim shortly after the shooting. Kim stated her husband shot defendant over a cell phone. She told Pallares her husband was upset with Breeding "because the cell phone wasn't on the night stand, and the day before [Breeding] had left and [defendant] was calling [Breeding] a thief."

Kim said Breeding had just returned the cell phone earlier that day. Kim said Breeding left but later returned and she was speaking to him in the garage. While she was speaking with Breeding, Kim heard a gunshot come from behind her and saw Breeding fall to the ground, bleeding from his head. She turned around and saw her husband with a gun. According to Kim's account, her husband fell to his knees, stating, "I didn't know, I didn't know."

After firing the gun, defendant went into the house. Investigators found a shotgun in the living room with one spent round in the chamber. When defendant came out of the house, he was unarmed, his hands were shaking, and he appeared scared.

In a recorded conversation between defendant and a friend visiting him at the jail, defendant told the friend in a stutter that he was scared, and when the friend stated defendant was "[s]cared for your life," defendant replied, "I never been so scared. It was—it was, I can't even explain it." The friend commented that Breeding should not have been there. Defendant said he had told Breeding "to stay away I don't [know] how many times." Defendant elaborated, saying, "So, either it was to see—to feed her ... addiction or there was going to be something inevitably going on between them but, I—I—that's not what I think. I think he was doing it to finally say you owe me, you're going to give me this or I'm taking it from you." Later defendant told his friend that after the shot, he vomited multiple times, drank some liquor, and smoked cigarettes.

Harris, 2018 WL 1516967, at *1–3.

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at

99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Instructional Error

1. Legal Standard

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). The "only question for [a federal habeas court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at

147). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).

In reviewing an ambiguous instruction, the Court "inquire[s] 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). With respect to omitted instructions, a petitioner's "burden is especially heavy because no erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

2.  Heat of Passion

In Ground One, Petitioner asserts that the trial court erred by giving an inadequate heat of passion instruction that allowed the jury to reject voluntary manslaughter if it found that a third party provoked Petitioner. (ECF No. 1 at 4). Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 27 at 13). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the heat of passion instructional error claim, the California Court of Appeal stated:

> Defendant contends the heat of passion instruction was inadequate because it allowed the jury to reject that defense if it found a third party other than defendant himself was the source of provocation. Defendant more specifically argues that although the standard instruction uses the terms "provoked" and "provocation," the instruction fails to meaningfully define these terms. According to defendant, the instructions further failed to indicate the victim need not have provoked defendant because the provocation could have come from third parties—neighbors Isaac Foreman and Jasmine Wilemon, who conducted the condom prank.

> The People reply this issue is waived because defendant seeks a pinpoint instruction and trial counsel did not seek any elaboration on CALCRIM No. 570. The People further argue on the merits the terms provoke and provocation do not

require further elaboration, and nothing in the instruction prevented the jury from applying provocation to the third party neighbors.

***CALCRIM No. 570***

CALCRIM No. 570 was read to the jury as follows:

> "A killing that would otherwise would [*sic*] be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone, because of a sudden quarrel or in the heat of passion if ... One, the defendant was provoked. Two, as a result of the provocation, the defendant acted rationally [*sic*] under the influence of intense emotion and that obscured his reasoning or judgement. And, three, the provocation would have caused a person of average disposition to act rationally [*sic*] and without due deliberation, and that is from passion, rather than from judgment.

> "Heat of passion does not require anger, range [*sic*], or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection in order for heat of passion [*sic*]. To reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. When no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked.

> "The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts, whatever [*sic*] he acted from passion rather than from judgment. If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning or judgment, then, the killing is not reduced to voluntary manslaughter on this basis. The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (See CALCRIM No. 570.)

***Forfeiture***

A trial court has no sua sponte duty to revise or improve an accurate statement of law without a request from counsel. Failure to request clarification of an otherwise correct instruction forfeits the claim of error on an appeal. (*People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Jones* (2014) 223 Cal.App.4th 995, 1001.) Some legal terms have technical meanings requiring further explanation. The terms provocation and heat of passion as used in standard jury instructions, however, bear their common meaning and require no further explanation in the absence of a specific request. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217–1218; *People v. Cox* (2003) 30 Cal.4th 916, 967, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1334.) Because defendant is not arguing the instruction as

given was incorrect, it was incumbent on his trial counsel to seek any appropriate elaboration on the instruction, and counsel's failure to do so means this issued is forfeited on appeal.

### *Merits of Defendant's Contention*

Although we find this issue forfeited, we alternatively conclude defendant's argument lacks merit. As noted above, the terms provoke and provocation bear common meanings requiring no further explanation by the trial court. (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1217–1218.) The standard language of CALCRIM No. 570 has been found to be legally correct and to properly convey the test necessary for the jury to determine whether a defendant has been sufficiently provoked. (*People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001; *People v. Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) The trial court has no sua sponte duty to give a pinpoint instruction relating particular facts to an element of the charged crime, thereby explaining or highlighting a defense theory. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390.)

Further, provocation was not used in the instruction in a technical sense peculiar to the law. We presume the jurors were aware of the common meaning of the term. Provocation means something that provokes, arouses, or stimulates. (*People v. Hernandez*, *supra*, 183 Cal.App.4th p. 1334.) Provoke means to arouse to a feeling or action, or to incite anger. (*Ibid.*, citing Webster's Collegiate Dict. (10th ed. 2002) p. 938 and *People v. Ward* (2005) 36 Cal.4th 186, 215.) There is, therefore, no special technical legal definition of the terms provocation and provoke requiring further explanation or elaboration by the trial court.

Defendant also argues CALCRIM No. 570 failed to direct the jury to the neighbors' condom prank as a source of provocation. As the People explain, the instruction did not preclude the jury from considering third party conduct defendant could reasonably have believed to have been done by Breeding. During a recording of defendant's jail conversation with his wife, defendant told her he thought the condom prank had been done by Breeding. During defendant's conversation with Jasmine Wilemon after the shooting regarding the condoms, defendant told her not to worry because she had nothing to do with anything. From the record presented at trial, it does not appear defendant blamed anyone except Breeding for the condom prank. CALCRIM No. 570 correctly instructed the jury on how to weigh evidence of provocation, including the condom incident defendant thought was carried out by Breeding. Defendant has failed to demonstrate the absence of further clarification of the meaning of provocation or reference of participation by third parties in any way diminished defendant's defense.

The People point out that before the shooting, defendant had warned Breeding not to come back to his house but Breeding did so anyway. The People argue this would have been far more provocative to defendant than the condom incident, which occurred a day or two prior to the shooting. We agree with this analysis of the facts adduced at trial. There was no instructional error and the instructions given adequately advised the jury how to evaluate evidence of provocation, including the condom incident.

Harris, 2018 WL 1516967, at *3–5.

*///*

The heat of passion instruction as given was a correct statement of state law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). It was objectively reasonable for the state court to conclude that the heat of passion instruction as given did not preclude the jury from considering third-party conduct, such as the neighbors' condom prank, as a source of provocation, and Petitioner has not demonstrated that the heat of passion "instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72.

Accordingly, the Court finds that the state court's rejection of the heat of passion instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief for his instructional error claim regarding provocation and heat of passion, and it should be denied.

　　　　3.　Self-Defense

In Ground Two, Petitioner asserts that the trial court erred by refusing to instruct the jury on self-defense and imperfect self-defense. (ECF No. 1 at 4). Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 27 at 16). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's self-defense jury instruction claim, the California Court of Appeal stated:

　　　　The trial court denied defendant's request for instructions for self-defense
　　　　(CALCRIM No. 505), defense of one's home or property (CALCRIM No. 506),
　　　　and imperfect self-defense (CALCRIM No. 571). Defendant argues the trial court

erred in refusing these instructions on self-defense and imperfect self-defense because during a conversation with his friend in jail, defendant said he was afraid during the incident. We reject this argument.

Even in the absence of a request from the defendant, the trial court in criminal cases must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) California law places a sua sponte duty on the trial court to instruct fully on all lesser necessarily included offenses supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.) Here, defendant requested the instructions not given by the trial court.

The doctrine of self-defense embraces both perfect and imperfect self-defense. Perfect self-defense requires the defendant have an honest and reasonable belief in the need to defend himself or herself. Imperfect self-defense is the killing of another under the actual but unreasonable belief the killer was in imminent danger of death or great bodily injury. The doctrine requires without exception that the defendant had an actual belief in the need for self-defense; fear of future harm, no matter how great the fear and no matter how great the likelihood of harm, does not suffice. The defendant's fear must be of imminent danger to life or great bodily injury. In imperfect self-defense, the killing is without malice and therefore does not constitute murder but manslaughter. It is a form of voluntary manslaughter. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)

There was no evidence defendant or his wife were in any danger of harm or that defendant believed he and his wife were in such danger. Defendant concedes in his argument that he had warned Breeding on several occasions to stay away from his home and his wife. Defendant argues he expressed fear of the situation to his friend during a conversation in jail. In a stutter, defendant told his friend he had been afraid. Defendant's friend suggested defendant was afraid of Breeding. Defendant said he had never been so scared but could not explain it. The friend stated Breeding should not have been there. To this comment, defendant replied he had told Breeding to stay away many times. Elaborating on this statement, defendant added, "So, either it was to see—to feed her ... addiction or there was going to be something inevitably going on between them but, I—I—that's not what I think. I think he was doing it to finally say you owe me, you're going to give me this or I'm taking it from you."

Read in context, defendant was not expressing fear of imminent harm to himself or his wife. Defendant never directly expressed fear for his life or for his wife's life. It is defendant's friend, not defendant himself, who suggested defendant was in fear of his life. In response to this statement from his friend, defendant vaguely referred to never being so scared. As defendant elaborated, however, he was afraid about the relationship his wife had with Breeding as well as what he apparently believed to be his wife's drug addiction.

Defendant may also have been expressing fear about the consequences of his actions. Later during the same conversation defendant told his friend that after the shot, he vomited multiple times, drank some liquor, and smoked several cigarettes.

Assuming arguendo defendant's jailhouse statement to his friend constituted substantial evidence he feared Breeding, we would find the trial court's failure to give self-defense instructions to be harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. There was no evidence presented at

trial showing Breeding was armed, he had ever verbally or physically threatened defendant or his wife, or he had a past history of making threats to defendant or to his wife. The opposite is true; there was evidence presented from multiple witnesses that defendant had threatened Breeding in the past in addition to telling him to stay away from the Harris home. Defendant showed his shotgun to others and boasted he would kill anyone sleeping with his wife. Some of these threats occurred weeks before the shooting. Isaac Foreman testified he heard defendant yelling and "going crazy" at the time of the shotgun blast. No witness described Breeding as yelling, uttering provocative statements, or threatening defendant or Kim.

Defendant argues Breeding "continued to invade" the Harris home. The jury was instructed on trespass and involuntary manslaughter.[6] Defense of habitation alone, however, can never justify homicide without self-defense or defense of others. The defendant must show he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360.)

There was no evidence showing Breeding was a threat to defendant or to his wife. Indeed, Breeding was invited onto the property by Kim, so he could not be an invader. Where a trespass is forcible, an owner may resist it, but is not justified in killing the trespasser unless it is necessary to defend himself or herself against the loss of life or great bodily harm. (See *People v. Hecker* (1895) 109 Cal. 451, 461–462.) "Self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance, or fault, to create a real or apparent necessity for killing." (*Id.* at p. 462.) In sum, the trial court did not err in denying defendant's request for self-defense instructions, and if there was error, it was harmless beyond a reasonable doubt.

Harris, 2018 WL 1516967, at *6–7 (footnotes in original).

"[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 576 U.S. 257, 269 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Ayala, 576 U.S. at 269–70 (quoting Richter, 562 U.S. at 103).

---

[6] The court instructed the jury with the general involuntary manslaughter instruction (CALCRIM No. 580) and the right to eject a trespasser from real property (CALCRIM No. 3475).

The appellate court's reasonable assessment of the evidence presented at trial supports its conclusion that the trial court's refusal to instruct the jury on self-defense and imperfect self-defense resulted in no prejudice. It was not objectively unreasonable for the state court to conclude that the evidence did not show imminent danger to life or great bodily injury of someone in the home. There was no evidence presented at trial showing that Breeding was armed or otherwise physically or verbally threatening Petitioner or Petitioner's wife, or that Breeding had previously threatened Petitioner or Petitioner's wife.

"An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," Kibbe, 431 U.S. at 155, and the Court finds that the state court's rejection of the self-defense and imperfect self-defense instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for his instructional error claim regarding self-defense and imperfect self-defense, and it should be denied.

### B. Admission of Prejudicial Evidence

In Ground Four, Petitioner asserts that the trial court abused its discretion in admitting evidence that Petitioner used an offensive racial epithet on one occasion when referring to the victim. (ECF No. 1 at 5). Respondent argues that the state court's rejection of the prejudicial evidence claim was reasonable. (ECF No. 27 at 17).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

///

///

In denying Petitioner's prejudicial evidence claim, the California Court of Appeal stated:

Defendant argues the trial court abused its discretion in admitting evidence of defendant's remark: "I never liked that nigger." Defendant contends use of the racial epithet was inflammatory and violated Evidence Code section 352. Defendant further argues his federal due process rights were also violated. We disagree.

***Evidentiary Ruling***

Defense counsel objected to the introduction of evidence of Adrian Wilemon hearing defendant refer to Breeding by using a racial epithet. The trial court conducted an Evidence Code section 402 hearing outside the presence of the jury on the admissibility of this evidence. Adrian Wilemon explained he heard defendant threaten to kill Breeding if defendant caught him "messing with his wife." Adrian denied, however, he ever heard defendant say he "never liked that nigger." Adrian could not remember talking to an investigator from the district attorney's office and telling him defendant had made this statement.

The prosecutor explained to the court she sought to impeach Adrian Wilemon with the testimony of the investigator who heard and recorded Adrian's statement to the contrary. Defense counsel vigorously objected to the statement as being too inflammatory to be admissible. The trial court agreed the statement was highly inflammatory, but found it was probative as to defendant's state of mind, and the statement also went to defendant's motive. The court acknowledged the statement was prejudicial but ruled the prejudicial effect of the statement did not outweigh its probative value. The court noted there were no African–Americans on the jury. The court ruled the prosecutor could present this evidence.

In his testimony before the jury, Adrian Wilemon said he did not remember defendant using the racial epithet to describe Breeding. The prosecutor called Investigator Daniel Stevenson, who testified he spoke with Adrian, who told him defendant did not like Breeding. Adrian further told Stevenson defendant had made general threats to kill anyone he thought was having sex with his wife, and Adrian heard defendant call Breeding "the N word or nigger."

***Analysis***

Only relevant evidence is admissible. All relevant evidence is admissible unless it is excluded under the United States or California Constitution or by statute. (*People v. Scheid* (1997) 16 Cal.4th 1, 13–14.) Evidence Code section 210 defines relevant evidence as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the proffered evidence tends to logically, naturally, or by reasonable inference establish material facts such as identity, intent, or motive. (*People v. Scheid*, *supra*, at p. 13.)

Under Evidence Code section 352, the trial court may exclude evidence if its probative value is substantially outweighed by the probability its admission will create substantial danger of undue prejudice. The admission of photographs of a victim lies within the broad discretion of the trial court when a defendant asserts the pictures are unduly gruesome or inflammatory. The trial court's exercise of discretion will not be disturbed on appeal unless the probative value of the racial epithet is clearly outweighed by its prejudicial effect. (*People v. Montes* (2014) 58 Cal.4th 809, 862; *People v. Ramirez* (2006) 39 Cal.4th 398, 453–454.) Prejudicial

evidence is evidence uniquely tending to evoke an emotional bias against a party as an individual with only slight probative value. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1248; *People v. Carey* (2007) 41 Cal.4th 109, 128.) A trial court's exercise of discretion under Evidence Code section 352 is upheld on appeal unless the court abused its discretion by exercising it in an arbitrary, capricious, or patently absurd manner. (*People v. Suff* (2014) 58 Cal.4th 1013, 1066.)

Expressions of racial animus by a defendant towards a victim and the victim's race, like other expressions of enmity by an accused murderer towards the victim, is relevant evidence under Evidence Code section 210. It constitutes evidence of the defendant's prior attitude toward the victim, a relevant factor in deciding whether the murder was deliberate and premeditated because it goes to the defendant's motive. Generally, racial epithets are not so inflammatory that their probative value is substantially outweighed by their potential for undue prejudice under Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 628.)

As explained by our Supreme Court in *Quartermain*:

> "The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant. Here, the racial epithets were only a small portion of the evidence concerning defendant's interviews with the police, and the prosecutor did not ask any follow-up questions or otherwise focus attention on them." (*People v. Quartermain, supra*, 16 Cal.4th at p. 628.)

The trial court considered the potential for undue prejudice to defendant if expression of his racial epithet directed at Breeding came into evidence. The court found the evidence relevant and its probative value outweighed its prejudicial effect on the jury. Here, the evidence demonstrated defendant harbored a long simmering anger toward Breeding that included not only the alleged affair with defendant's wife, but Breeding's race. As noted by the trial court, this evidence was probative of defendant's state of mind as well as his motive to kill Breeding. The trial court did not abuse its discretion in allowing defendant's prior statement into evidence pursuant to Evidence Code sections 210 and 352.

Defendant further argues his constitutional right to due process was implicated by the trial court's ruling. The admission of relevant evidence found not to be unduly prejudicial also did not violate defendant's right to due process because it did not render defendant's trial fundamentally unfair. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.) We reject defendant's constitutional challenge to the admissibility of this evidence.

Harris, 2018 WL 1516967, at *7–9.

Admission of evidence is an issue of state law, and errors of state law do not warrant federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The pertinent question on habeas review is whether the state proceedings satisfied

due process and "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995)). The petitioner in Holley was charged with multiple felony counts of lewd and lascivious acts on a child under fourteen and challenged the trial court's admission of a lewd matchbook and several sexually explicit magazines seized from the petitioner's bedroom. Holley, 568 F.3d at 1096. The Ninth Circuit denied habeas relief because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ [of habeas corpus]." Id. at 1101. "Absent such 'clearly established Federal law,'" the Holley court could not "conclude that the state court's ruling was an 'unreasonable application.'" Id. (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)).

Holley's conclusion "that there was, at that time, no clearly established federal law providing that the 'admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ' . . . remains true," and this Court is bound by the Ninth Circuit's decision in Holley. Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir. 2021) (quoting Holley, 568 F.3d at 1101)). Although circuit caselaw is not governing law under AEDPA, the Court must follow Ninth Circuit precedent that has determined what federal law is clearly established. Byrd v. Lewis, 566 F.3d 855, 860 n.5 (9th Cir. 2009). See Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc) (Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents.").

Because there is no Supreme Court holding that establishes the fundamental unfairness of admitting prejudicial evidence, the California Court of Appeal's denial was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. The Court must defer to the state court's decision. Accordingly, Petitioner is not entitled to habeas relief on his prejudicial evidence claim, and it should be denied.

1        **C.  Sentencing Error**

2        In Ground Five, Petitioner asserts that the sentencing court abused its discretion in not

3    striking the gun use enhancement on remand pursuant to Senate Bill No. 620 ("SB 620"). (ECF

4    No. 1 at 7). Respondent argues that this claim is not cognizable because the state law error

5    presents no federal question. (ECF No. 27 at 21). Whether Petitioner's gun use enhancement

6    should have been stricken pursuant to SB 620 is an issue of state law that is not cognizable in

7    federal habeas corpus. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only

8    noncompliance with federal law that renders a State's criminal judgment susceptible to collateral

9    attack in the federal courts."); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the

10   province of a federal habeas court to reexamine state-court determinations on state-law

11   questions."); Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of

12   fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify

13   federal habeas relief."). Accordingly, Petitioner is not entitled to habeas relief on his sentencing

14   error claim, and it should be denied.

15       **D.  Ineffective Assistance of Counsel**

16       In Grounds Three and Five, Petitioner asserts ineffective assistance of trial counsel for:

17   (1) failing to argue that Petitioner was legally provoked by the condom prank; (2) failing to

18   litigate issues regarding Petitioner's mental health; and (3) failing to file a notice of appeal

19   regarding the SB 620 hearing. (ECF No. 1 at 5–7, 12). In Ground Five, Petitioner also asserts

20   ineffective assistance of appellate counsel for: (1) failing to litigate issues regarding Petitioner's

21   mental health; and (2) failing to develop and raise claims on appeal and/or in habeas corpus that

22   Petitioner now raises in the instant petition. (ECF No. 1 at 7, 12).

23       1.  *Strickland* Legal Standard

24       The clearly established federal law governing ineffective assistance of counsel claims is

25   Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging

26   ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at

27   687. First, the petitioner must show that counsel's performance was deficient, requiring a

28   showing that counsel made errors so serious that he or she was not functioning as the "counsel"

guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in

order to afford 'both the state court and the defense attorney the benefit of the doubt.'" <u>Woods v.</u> <u>Donald</u>, 575 U.S. 312, 316–17 (2015) (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the inquiry is "whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S. at 105.

### 2. Failure to Argue Third-Party Provocation

Petitioner asserts that trial counsel was ineffective for failing to argue that Petitioner was legally provoked by the condom prank. (ECF No. 1 at 5). Respondent argues that it was reasonable to reject Petitioner's trial-related ineffectiveness claims. (ECF No. 27 at 18). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Wilson</u>, 138 S. Ct at 1192.

In denying Petitioner's ineffective assistance of trial counsel claim regarding the third-party provocation theory, the California Court of Appeal stated:

> During closing argument to the jury, defense counsel referred to the condom prank carried out by Foreman and Jasmine Wilemon, but argued Foreman's account of not directly participating was inconsistent with Jasmine's account and showed Foreman's testimony lacked general credibility. Defense counsel did not otherwise make other argument concerning the incident and did not argue it, too, could have provoked defendant.

> Defendant contends his trial counsel was ineffective for failing to argue a third party provocation theory to the jury based on the neighbors' condom prank. Defendant argues his counsel was ineffective for failing to argue the prank was sufficient provocation to constitute heat of passion. We disagree.

> A defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Williams v. Taylor* (2000) 529 U.S. 362, 391, 394; *In re Hardy* (2007) 41 Cal.4th 977, 1018.) A reasonable probability is one sufficient to undermine confidence in the outcome. The second question is not one of outcome determination but whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. (*In re Hardy*, *supra*, at p. 1019.)

> A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors are generally not deemed reversible. Counsel's decisionmaking is evaluated in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Attorneys are not expected to engage in tactics or to file motions that are futile. (*Id.* at p. 419; also see *People v. Mendoza* (2000) 24 Cal.4th 130, 166.)

> As the People have argued and we have explained above, this argument is not persuasive given the context of defendant's actions. Defendant's wife was apparently having an affair with Breeding for some time prior to the shooting. Defendant had seen the two alone in a room together late at night when defendant unexpectedly returned home from the graveyard shift to get medication. During her closing argument, defense counsel focused the jury's attention on Breeding's conduct, including the fact Breeding came back to defendant's home after being told to stay away. Defense counsel argued this conduct was provocative enough to justify a conviction for manslaughter rather than first or second degree murder.

> Defense counsel was more effective in trying to turn the jury's scrutiny to Breeding's most recent conduct because this conduct left defendant with less time to cool down than the condom incident occurring earlier. Defendant's ire at Breeding was more likely fueled by what appeared to be an affair with his wife than the condom prank—whether or not the jury found defendant thought Breeding carried out the prank or it was done by his neighbors. Defense counsel's argument centered on heat of passion caused by his wife's alleged affair with Breeding, which would supersede the condom prank in its emotional intensity.

> Defendant has failed to show defense counsel's representation fell below professional norms in how she argued provocation in her closing argument. Defendant has further failed to demonstrate defense counsel's failure to add the condom prank to her closing argument was prejudicial to defendant's defense.

Harris, 2018 WL 1516967, at *5–6.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003). Because "which issues to sharpen and how best to clarify them [during closing argument] are questions with many reasonable answers," "[j]udicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas." Id. at 6. Therefore, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical

1  reasons rather than through sheer neglect." <u>Gentry</u>, 540 U.S. at 8 (citing <u>Strickland</u>, 466 U.S. at

2  690).

3      <u>Strickland</u> instructs that courts "must indulge a strong presumption that counsel's conduct

4  falls within the wide range of reasonable professional assistance," 466 U.S. at 689, and the

5  California Court of Appeal's determination that Petitioner "failed to show defense counsel's

6  representation fell below professional norms in how she argued provocation in her closing

7  argument," <u>Harris</u>, 2018 WL 1516967, at *6, was not objectively unreasonable. The third-party

8  provocation "issue[] counsel omitted w[as] not so clearly more persuasive than those [s]he

9  discussed that the[] omission can only be attributed to a professional error of constitutional

10  magnitude." <u>Gentry</u>, 540 U.S. at 9. In fact, as set forth by the California Court of Appeal, it was

11  reasonable to conclude that counsel's focus on Breeding's affair with Petitioner's wife, which

12  would surpass the condom prank in emotional intensity, and Breeding's most recent conduct,

13  which left Petitioner with less time to cool down than the earlier condom prank, was a more

14  effective argument to the jury.

15      Based on the foregoing, under AEDPA's "doubly deferential" review, <u>Donald</u>, 575 U.S.

16  at 316, the Court finds that the state court's rejection of Petitioner's ineffective assistance claim

17  regarding the third-party provocation theory was not contrary to, or an unreasonable application

18  of, clearly established federal law, nor was it based on an unreasonable determination of fact.

19  The decision was not "so lacking in justification that there was an error well understood and

20  comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562

21  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of

22  counsel on this ground, and the claim should be denied.

23      3.  <u>Mental Health Issues</u>

24      Petitioner asserts that trial counsel was ineffective for failing to challenge Petitioner's

25  competency to stand trial and for failing to introduce evidence of Petitioner's psychiatric care at

26  trial. (ECF No. 1 at 13–14). Respondent argues that it was reasonable to reject Petitioner's trial-

27  related ineffectiveness claims. (ECF No. 27 at 18). This claim was raised in a state habeas

28  petition filed in the California Supreme Court, which summarily denied the petition. (LD 22).

1  There is no reasoned state court decision on this claim, and the Court presumes that the state

2  court adjudicated the claim on the merits. See Johnson, 568 U.S. at 301. Accordingly, AEDPA's

3  deferential standard of review applies, and the Court "must determine what arguments or theories

4  . . . could have supported, the state court's decision; and then it must ask whether it is possible

5  fairminded jurists could disagree that those arguments or theories are inconsistent with the

6  holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

7                                        **a.  Competency to Stand Trial**

8        "[T]o succeed on a claim that counsel was ineffective for failing to move for a

9  competency hearing, there must be 'sufficient indicia of incompetence to give objectively

10  reasonable counsel reason to doubt defendant's competency' and 'a reasonable probability that

11  the defendant would have been found incompetent.'" Dixon v. Ryan, 932 F.3d 789, 802 (9th Cir.

12  2019) (quoting Hibbler v. Benedetti, 693 F.3d 1140, 1149–50 (9th Cir. 2012)). "A defendant is

13  deemed competent to stand trial if he 'has sufficient present ability to consult with his lawyer

14  with a reasonable degree of rational understanding and . . . has a rational as well as factual

15  understanding of the proceedings against him.'" Clark v. Arnold, 769 F.3d 711, 729 (9th Cir.

16  2014) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)).

17        Petitioner alleges that trial counsel Singh knew of Petitioner's mental health treatment

18  history and did not believe that Petitioner was mentally stable enough to testify on his own

19  behalf. (ECF No. 1 at 14, 22). Although Petitioner appears to argue that these allegations should

20  have given counsel reason to doubt Petitioner's competence to stand trial, a history of mental

21  health treatment and lack of confidence in Petitioner's ability to withstand one to two days of

22  questioning from the prosecution at trial would not necessarily have raised questions regarding

23  Petitioner's ability to consult with counsel with a reasonable degree of rational understanding or

24  Petitioner's rational and factual understanding of the proceedings against him.

25        Based on the foregoing, under AEDPA's "doubly deferential" review, Donald, 575 U.S.

26  at 316, the Court finds that the state court's rejection of Petitioner's ineffective assistance claim

27  regarding trial counsel's failure to challenge Petitioner's competency to stand trial was not

28  contrary to, or an unreasonable application of, clearly established federal law, nor was it based

1  on an unreasonable determination of fact. The decision was not "so lacking in justification that

2  there was an error well understood and comprehended in existing law beyond any possibility for

3  fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

4  habeas relief for ineffective assistance of counsel on this ground, and the claim should be denied.

5  **b.  Evidence of Psychiatric Care**

6  The petition does not explain Petitioner's mental health issues or his treatment history in

7  detail, but rather contains vague language concerning Petitioner's psychiatric care since

8  approximately 2004, "years of 'mental health care,'" and "psychiatrically prescribed meds."

9  (ECF No. 1 at 14, 22). However, Petitioner did present the California Supreme Court with

10  limited mental health records, which consist of records of his January 18, 2005 initial evaluation

11  and a May 9, 2013 visit. (ECF No. 26-22 at 17–20).

12  "AEDPA . . . restricts the scope of the evidence that we can rely on in the normal course

13  of discharging our responsibilities under § 2254(d)(1)." Murray v. Schriro, 745 F.3d 984, 998

14  (9th Cir. 2014). "AEDPA's 'backward-looking language requires an examination of the state-

15  court decision at the time it was made. It [then logically] follows that the record under review is

16  limited to the record in existence at that same time, *i.e.*, the record before the state court.'" Id.

17  (alteration in original) (quoting Cullen v. Pinholster, 563 U.S. 170, 182 (2011)). Therefore, this

18  Court will look to the state habeas petition presented to the California Supreme Court and any

19  attachments thereto rather than the petition filed in this Court.

20  The record of the January 18, 2005 visit indicates that Petitioner came in for an initial

21  evaluation and to start medication management. The record states that Petitioner had a history of

22  whining and getting angry easily and was diagnosed with ADHD when he was young. There was

23  no history of mood swings, depression, feeling hopeless, suicidal ideation, delusions, voices,

24  visions, or paranoia. (ECF No. 26-22 at 19). The mental status examination describes Petitioner

25  as alert, oriented, very hyper, and not sitting still, his thought content as fair, memory as

26  decreased, judgment and insight as fair, attention and concentration as poor, intellectual

27  functions as fair, and with no current suicidal or homicidal ideation. (Id. at 20).

28  ///

The record of the May 9, 2013 visit[7] references Petitioner's ADHD diagnosis and indicates that Petitioner was taking medication and came in for a routine follow-up appointment for progress evaluation and medication management. (ECF No. 26-22 at 17–18). The record states that Petitioner had no complaints and no behavioral problems and that he denied delusions, voices, visions, paranoia, and suicidal and homicidal ideation. Petitioner's medications were taken regularly with no noted side effects. The record also describes Petitioner as sitting calmly with no abnormal movements, having fair hygiene and appearance, fair eye contact, good speech volume and rhythm, good mood and appropriate affect, fair thought content and process, and fair insight and judgment. The record further indicates that Petitioner was "at baseline" and "remain[ed] safe to treat at outpatient," although "continuous efforts w[ould] be made to improve the impaired level of functioning." (ECF No. 26-22 at 17).

Petitioner asserts that trial counsel Singh was ineffective because she "[k]new of [Petitioner]'s mental health issues and made a professional/strategic determination not to raise them." (ECF No. 1 at 13). Petitioner alleges that he asked trial counsel why she did not use his years of mental health care at trial and that counsel responded, "then, the D.A. would have been able to introduce the illegal drugs in your system beyond that of the psychiatrically prescribed meds." (ECF No. 1 at 22). Petitioner further alleges that when he asked trial counsel why she did not call Petitioner's psychiatrist and introduce the years of psychiatric care Petitioner received, counsel claimed that Petitioner exhibited no signs of mental instability. (Id.).

"The law . . . does not permit us to second-guess the trial attorney's strategy. Instead, 'every effort [must] be made to eliminate the distorting effect of hindsight. We must therefore resist the temptation 'to conclude that a particular act or omission was unreasonable' simply because it 'proved unsuccessful' at trial." Daire v. Lattimore, 818 F.3d 454, 465 (9th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Atwood v. Ryan, 870 F.3d 1033, 1064 (9th Cir. 2017) (alteration in original)

---

[7] This visit occurred approximately one month before Breeding's death.

1  (internal quotation marks omitted) (quoting Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir.
2  1998)).

3       Here, Petitioner acknowledges that trial counsel "made a professional/strategic
4  determination not to raise" Petitioner's mental health issues and his treatment history. (ECF No.
5  1 at 13). The documents submitted to the California Supreme Court regarding Petitioner's mental
6  health treatment history indicate that although Petitioner had been diagnosed with ADHD and
7  was prescribed medication, Petitioner had no behavioral problems, was taking medication with
8  no noted side effects, had fair thought content and process, and had fair insight and judgment.
9  The records do not demonstrate that Petitioner's mental health issues had an impact on
10 Petitioner's ability to form the required mental state for the offense. Given that "counsel is
11 strongly presumed to have rendered adequate assistance and made all significant decisions in the
12 exercise of reasonable professional judgment," Strickland, 466 U.S. at 690, the California
13 Supreme Court reasonably could have concluded that counsel did not perform deficiently by not
14 introducing mental health evidence and instead pursuing a heat of passion defense focused on
15 Breeding's affair with Petitioner's wife.

16      Further, even if trial counsel performed deficiently, the California Supreme Court
17 reasonably could have concluded that Petitioner failed to establish "a reasonable probability that,
18 but for counsel's unprofessional errors, the result of the proceeding would have been different."
19 Strickland, 466 U.S. at 694. See Sully v. Ayers, 725 F.3d 1057, 1070 (9th Cir. 2013) (finding
20 state court was not unreasonable in concluding no prejudice stemmed from counsel's failure to
21 investigate mental state because while petitioner "proffered evidence showing that he was
22 generally consuming large quantities of cocaine and suffering various psychotic symptoms
23 around the time of the murders, none of the evidence relates to the impact of his cocaine usage or
24 psychotic symptoms on specific instances of murder").

25      Based on the foregoing, under AEDPA's "doubly deferential" review, Donald, 575 U.S.
26 at 316, the Court finds that the state court's rejection of Petitioner's ineffective assistance claim
27 regarding trial counsel's failure to introduce evidence of Petitioner's mental health and treatment
28 history was not contrary to, or an unreasonable application of, clearly established federal law,

1  nor was it based on an unreasonable determination of fact. The decision was not "so lacking in

2  justification that there was an error well understood and comprehended in existing law beyond

3  any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is

4  not entitled to habeas relief for ineffective assistance of counsel on this ground, and the claim

5  should be denied.

6         4.  <u>Appellate Counsel</u>

7       Petitioner asserts that appellate counsel was ineffective for failing to litigate issues

8  regarding Petitioner's mental health and failing to develop and raise claims on appeal and/or in

9  habeas corpus that Petitioner now raises in the instant petition. (ECF No. 1 at 7, 12).

10  Respondent argues that it was reasonable to reject this claim because appellate counsel need only

11  raise claims most likely to prevail on appeal as limited to the four corners of the record on appeal

12  and there is no federal constitution right to counsel when seeking state postconviction relief.

13  (ECF No. 27 at 21). This claim was raised in a state habeas petition filed in the California

14  Supreme Court, which summarily denied the petition. (LD 22). There is no reasoned state court

15  decision on this claim, and the Court presumes that the state court adjudicated the claim on the

16  merits. <u>See</u> <u>Johnson</u>, 568 U.S. at 301. Accordingly, AEDPA's deferential standard of review

17  applies, and the Court "must determine what arguments or theories . . . could have supported, the

18  state court's decision; and then it must ask whether it is possible fairminded jurists could

19  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

20  [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

21       As noted by Respondent, "[a]ppellate jurisdiction is limited to the four corners of the

22  record on appeal." <u>In re Carpenter</u>, 9 Cal. 4th 634, 646 (1995). Further, "[u]sually ineffective

23  assistance of counsel claims are properly decided in a habeas corpus proceeding rather than on

24  appeal." <u>People v. Carrasco</u>, 59 Cal. 4th 924, 980 (2014) (citing <u>People v. Tello</u>, 15 Cal. 4th 264,

25  266–267 (1997)). In a response letter to Petitioner, appellate counsel stated:

26         The issue about trial counsel's failure to bring up mental health treatment is a
       potential IAC claim. I did not question trial counsel about this issue. It goes

27         beyond the record on appeal, so you will need to file a state habeas raising IAC
       in order to exhaust this claim prior to your 2254 petition.

28

> The jury's statement that the "racial slur" influenced their decision is outside the appellate record, and is something you will need to address in your 2254 petition/state habeas.

(ECF No. 1 at 39). As set forth in the letter, appellate counsel was constrained by the trial record. Accordingly, appellate counsel was not deficient for failing to raise an ineffective assistance of trial counsel claim or failing to litigate issues regarding Petitioner's mental health that relied on evidence outside the record on appeal. Additionally, there is no constitutional right to counsel in state postconviction proceedings. Garza v. Idaho, 139 S. Ct. 738, 749 (2019) (citing Pennsylvania v. Finley, 481 U.S. 551, 555 (1987)). Therefore, the California Supreme Court could have reasonably determined that Petitioner's appellate counsel did not perform deficiently by failing to develop and raise claims in a state postconviction proceeding that Petitioner now raises in the instant petition.

Under AEDPA's "doubly deferential" review of ineffective assistance of counsel claims, Donald, 135 S. Ct. at 1376, the Court finds that the California Supreme Court's decision denying Petitioner's ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of appellate counsel, and the claim should be denied.

5.   Failure to File Notice of Appeal

Petitioner asserts that trial counsel was ineffective for failing to file a notice of appeal regarding the SB 620 hearing. (ECF No. 1 at 12). Respondent argues that "there was at least a reasonable argument that the state petition did not support an inference that during the time to appeal Petitioner expressly told [trial counsel] to pursue an appeal" and that it was reasonable to find Petitioner failed to show prejudice. (ECF No. 27 at 22). This claim was raised in a state habeas petition filed in the California Supreme Court, which summarily denied the petition. (LD 22). There is no reasoned state court decision on this claim, and the Court presumes that the state court adjudicated the claim on the merits. See Johnson, 568 U.S. at 301. Accordingly, AEDPA's

1   deferential standard of review applies, and the Court "must determine what arguments or theories

2   . . . could have supported, the state court's decision; and then it must ask whether it is possible

3   fairminded jurists could disagree that those arguments or theories are inconsistent with the

4   holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

5       Strickland "applies to claims . . . that counsel was constitutionally ineffective for failing

6   to file a notice of appeal," and the Supreme Court has "long held that a lawyer who disregards

7   specific instructions from the defendant to file a notice of appeal acts in a manner that is

8   professionally unreasonable." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000).

> In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. We employ the term "consult" to convey a specific meaning—advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance.

17  Flores-Ortega, 528 U.S. at 478 (citation omitted).

> [C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known.

22  Flores-Ortega, 528 U.S. at 480.

23      "[T]o show prejudice in these circumstances, a defendant must demonstrate that there is a

24  reasonable probability that, but for counsel's deficient failure to consult with him about an

25  appeal, he would have timely appealed." Flores-Ortega, 528 U.S. at 484. "[P]rejudice is

26  presumed 'when counsel's constitutionally deficient performance deprives a defendant of an

27  appeal that he otherwise would have taken.'" Garza v. Idaho, 139 S. Ct. 738, 744 (2019) (quoting

28  Flores-Ortega, 528 U. S. at 484).

As "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," <u>Pinholster</u>, 563 U.S. at 181, this Court will look to the state habeas petition presented to the California Supreme Court and any attachments thereto rather than the petition filed in this Court. In the state habeas petition filed in the California Supreme Court, Petitioner alleged:

> At the SB620 – hearing Mr. Harris asked Ms. Singh about filling [*sic*] an appeal of the judge's denial to strike the gun enhancement, Ms. Singh said she would contact Mr. Warriner (appellate counsel) about it (Harris Declaration) yet she never did (see Exhibit – D, postit note attached to some correspondence from Mr. Warriner to Mr. Harris).

(ECF No. 26-22 at 8–9). In a sworn declaration attached to the state habeas petition, Petitioner stated: "I asked Ms. Singh if she would appeal the denial, by the judge, of the SB620 striking of the 25-year to life gun enhancement. Ms. Singh stated that she would contact my appeal counsel about that issue." (<u>Id.</u> at 25). Petitioner also presented a Post-It note bearing prior appellate counsel Warriner's apparent signature that stated "Pam [Singh] didn't contact me about appealing the gun enhancement." (ECF No. 26-21 at 29; ECF No. 26-22 at 47; ECF No. 27 at 25).

Respondent argues that "[a]t least one fairminded jurist's view of the state court presentation allowed for at least a reasonable argument that Petitioner chose not to include [a] straightforward statement" that Petitioner "expressly told [trial counsel] Singh to file a notice of appeal—and that he did so in time for Singh to file the notice by December 31, 2018[.]" (ECF No. 27 at 23). Respondent contends that "a fairminded jurist could observe that the careful-partitioning of the declaration ensured that it surgically omitted a sworn representation as to just when, after the denial [of the SB 620 striking of the gun enhancement], Petitioner made that communication to Singh [regarding an appeal], or just when she responded." (ECF No. 27 at 23–24). Respondent asserts that it was within Petitioner's ability to specifically state "(1) that he in fact told Singh to start an appeal and (2) when," and that there is a reasonable argument that "by choosing vague language and omitting dates . . . Petitioner chose not to provide stronger evidence" and "that such poor effort in the state petition warranted an affirmative inference that he knew the true facts were adverse." (ECF No. 27 at 25).

Here, Respondent focuses almost exclusively on Petitioner's sworn declaration, which does not include details regarding *when* Petitioner communicated to counsel regarding an appeal. However, in the state habeas petition filed in the California Supreme Court, Petitioner alleged that "*[a]t the SB620 – hearing* Mr. Harris asked Ms. Singh about filling [*sic*] an appeal of the judge's denial to strike the gun enhancement[.]" (ECF No. 26-22 at 8–9 (emphasis added)). "[W]hen the California Supreme Court issues a summary denial of a habeas claim, it '*generally assumes the allegations in the petition to be true*, but does not accept wholly conclusory allegations, and will also review the record of the trial to assess the merits of the petitioner's claims.'" Livaditis v. Davis, 933 F.3d 1036, 1045 (9th Cir. 2019) (emphasis added) (quoting Pinholster, 563 U.S. at 188 n.12). Therefore, based on both the allegations in the state habeas petition and Petitioner's sworn declaration, the record before the California Supreme Court was that: Petitioner asked trial counsel about filing an appeal of the judge's denial to strike the gun enhancement at the SB 620 hearing, trial counsel said she would contact appellate counsel about the issue, there was a notation from appellate counsel stating that trial counsel did not contact him about appealing the gun enhancement, and no notice of appeal was filed.

As there are no allegations whatsoever regarding a failure to consult with Petitioner about an appeal, in summarily denying Petitioner's ineffective assistance of counsel claim for failure to file a notice of appeal, the California Supreme Court could have concluded there was no ineffectiveness only if it found that: (1) Petitioner did not instruct counsel to file an appeal; or (2) Petitioner did not establish prejudice resulting from counsel's deficient performance.

 "A state court's decision is based on unreasonable determination of the facts under § 2254(d)(2)[8] if the state court's findings are 'unsupported by sufficient evidence,' if the 'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'"

---

[8] A different provision of AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The Ninth Circuit's "panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings," Murray, 745 F.3d at 1001, and the Supreme Court has not addressed the relationship between § 2254(d)(2) and (e)(1), Wood v. Allen, 558 U.S. 290, 300 (2010). However, the Court "need not address the interaction between § 2254(d)(2) and (e)(1) when the petitioner's claims fail to satisfy either provision." Atwood v. Ryan, 870 F.3d 1033, 1047 (9th Cir. 2017) (citing Murray, 745 F.3d at 1001). "Indeed, it is difficult to imagine a case in which a court would find that a state court decision was 'an unreasonable determination of the facts,' but that the petitioner had not rebutted the 'presumption of correctness by clear and convincing evidence.'" Apelt v. Ryan, 878 F.3d 800, 837 n.23 (9th Cir. 2017).

1   Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) (quoting Taylor v. Maddox, 366 F.3d

2   992, 999 (9th Cir. 2004)). "[U]nder § 2254(d)(2), a federal court 'may not second-guess' a state

3   court's factual findings unless 'the state court was not merely wrong, but actually unreasonable'

4   in light of the record before it." Atwood v. Ryan, 870 F.3d 1033, 1047 (9th Cir. 2017) (quoting

5   Taylor, 366 F.3d at 999).

6       The Court finds that a determination that Petitioner did not instruct counsel to file a

7   notice of appeal would be unreasonable under 28 U.S.C. § 2254(d)(2). Petitioner's allegations in

8   the state habeas petition and declaration—"Mr. Harris asked Ms. Singh about filling [*sic*] an

9   appeal of the judge's denial to strike the gun enhancement" and "I asked Ms. Singh if she would

10  appeal the denial, by the judge, of the SB620 striking of the 25-year to life gun enhancement"—

11  initially may appear as reasonably demonstrating to counsel that Petitioner was interested in

12  appealing but falling short of establishing that Petitioner specifically or expressly instructed

13  counsel to file a notice of appeal. However, given that counsel's response to Petitioner's

14  statement was to say that she would contact Petitioner's appellate counsel about an appeal, it

15  appears that trial counsel herself construed Petitioner's statement as instructions to file an appeal

16  and her stated response was consistent with such instructions. Therefore, considering the whole

17  record (including counsel's response) rather than a technical parsing of Petitioner's pro se

18  allegations regarding Petitioner's statement to trial counsel, the Court is "'convinced that an

19  appellate panel, applying the normal standards of appellate review, could not reasonably

20  conclude that the finding is supported by the record' before the state court" and that the

21  California Supreme Court made a decision based on an unreasonable determination of the facts.

22  Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir. 2014) (quoting Taylor, 366 F.3d at 1000).

23      Having found that a determination that Petitioner did not instruct counsel to file a notice

24  of appeal would be unreasonable under 28 U.S.C. § 2254(d)(2), it follows that a determination

25  that Petitioner did not establish prejudice also would be objectively unreasonable. See Manning

26  v. Foster, 224 F.3d 1129, 1136 (9th Cir. 2000) ("[P]rejudice is presumed when an attorney fails

27  to file an appeal against the petitioner's express wishes. Such failure always constitutes

28  ineffective assistance of counsel." (citations omitted)).

Respondent relies on <u>Canales v. Roe</u>, 151 F.3d 1226 (9th Cir. 1998), for the proposition that counsel's deficiency did not cause Petitioner to lose his appellate rights because "'California provides an avenue of relief for a defendant whose counsel has filed a late notice of appeal' and has, 'time and time again, declared that the loss of appeal rights can easily be remedied where counsel has erred. . . . The defendant need only act in a timely fashion. . . .'" (ECF No. 27 at 26 (quoting <u>Canales</u>, 151 F.3d at 1230)). Initially, the Court notes that <u>Canales</u> was decided before <u>Flores-Ortega</u>, and it is unclear to what extent <u>Canales</u> was abrogated by <u>Flores-Ortega</u>. Further, <u>Canales</u> can be differentiated from the instant matter because counsel filed an untimely notice of appeal and "the state trial court notified Canales of the untimeliness of his appeal and directed him toward a potential avenue of relief." <u>Canales</u>, 151 F.3d at 1230. Because Canales "failed to follow that direction," the Ninth Circuit found that "[u]ltimately, it cannot be said that inadequate performance by counsel denied him the right to an appeal." <u>Id.</u> <u>See also</u> <u>Garcia v. Foulk</u>, No. 1:14-cv-00461-AWI-SKO, 2015 WL 6689651, at *4 (E.D. Cal. Oct. 28, 2015) ("Like Canales, Petitioner initially lost his right to appeal by his trial attorney's ineffective assistance, but ultimately lost it again through his own failure to act after the California Court of Appeals reopened a time period in which he could file a notice of appeal. When a defendant fails to follow the path to relief mapped out for him by the state court, 'it cannot be said that inadequate performance by counsel denied him the right to an appeal.'" (quoting <u>Canales</u>, 151 F.3d at 1230)). In contrast, here, counsel failed to file a notice of appeal, and Petitioner was not directed toward a potential path of relief.

Based on the foregoing, the Court finds that the state court's decision denying Petitioner's ineffective assistance claim for failure to file a notice of appeal was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### E.  Expansion of Record and Evidentiary Hearing

If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts,

1  we evaluate the claim de novo, and we may consider evidence properly presented
2  for the first time in federal court.

3  Hurles, 752 F.3d at 778.

4      "AEDPA [28 U.S.C. § 2254(e)(2)] constrains when the district court may hold an
5  evidentiary hearing or expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases
6  if a state prisoner seeking federal habeas relief has failed to develop the factual record that
7  supports a claim in state court." Rhoades v. Henry, 598 F.3d 511, 517 (9th Cir. 2010) (citing
8  Holland v. Jackson, 542 U.S. 649, 652–53 (2004) (per curiam); Cooper-Smith v. Palmateer, 397
9  F.3d 1236, 1241 (9th Cir. 2005)). "[A] failure to develop the factual basis of a claim is not
10 established unless there is lack of diligence, or some greater fault, attributable to the prisoner or
11 the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). "Diligence for purposes
12 of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable
13 attempt, in light of the information available at the time, to investigate and pursue claims in state
14 court[.]" Id. at 435.

15      Here, the record before the Court demonstrates that Petitioner exercised diligence to
16 develop the factual basis of his ineffective assistance of counsel claim for failure to file a notice
17 of appeal. Prior to filing his state habeas petitions, Petitioner wrote a letter to trial counsel
18 asking, *inter alia*, why she did not file a notice of appeal with respect to the SB 620 hearing.
19 (ECF No. 1 at 33–35). Petitioner also obtained and presented to the state courts a copy of a Post-
20 It note bearing prior appellate counsel Warriner's apparent signature that stated that trial counsel
21 "Pam [Singh] didn't contact me about appealing the gun enhancement." (ECF No. 26-21 at 29;
22 ECF No. 26-22 at 47). Additionally, the state courts denied Petitioner's state habeas petitions
23 without ordering formal pleadings. "Because [Petitioner] never reached the stage of the [state
24 habeas] proceedings at which an evidentiary hearing should be requested, he has not shown 'a
25 lack of diligence at the relevant stages of the state court proceedings' and therefore is not subject
26 to AEDPA's restrictions on evidentiary hearings." Horton v. Mayle, 408 F.3d 570, 582 n.6 (9th
27 Cir. 2005).

28 ///

1    As the record before the Court demonstrates that Petitioner did not fail to develop the

2  factual basis for his ineffective assistance of counsel claim for failure to file a notice of appeal,

3  the Court may expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases.[9]

4    In addition, where, as here, the "petitioner has not failed to develop the factual basis of

5  his claim as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing is required if (1) the

6  petitioner has shown his entitlement to an evidentiary hearing pursuant to Townsend v. Sain . . .

7  and (2) the allegations, if true, would entitle him to relief." Hurles, 752 F.3d at 791 (citing

8  Stanley v. Schriro, 598 F.3d 612, 624 (9th Cir. 2010)). Townsend held that a federal court must

9  grant an evidentiary hearing if:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the
> state factual determination is not fairly supported by the record as a whole; (3) the
> fact-finding procedure employed by the state court was not adequate to afford a
> full and fair hearing; (4) there is a substantial allegation of newly discovered
> evidence; (5) the material facts were not adequately developed at the state-court
> hearing; or (6) for any reason it appears that the state trier of fact did not afford
> the habeas applicant a full and fair fact hearing.

14  Townsend v. Sain, 372 U.S. 293, 313 (1963), overruled on other grounds by Keeney v. Tamayo-

15  Reyes, 504 U.S. 1 (1992).

16    Petitioner was not afforded an evidentiary hearing in state court. As set forth in section

17  IV(D)(5), *supra*, a determination that Petitioner did not instruct counsel to file a notice of appeal

18  is not fairly supported by the record as a whole and Petitioner's allegations, if true, would entitle

19  him to relief. Accordingly, an evidentiary hearing on Petitioner's ineffective assistance of

20  counsel claim for failure to file a notice of appeal is warranted.

## V.

## RECOMMENDATION

23    Based on the foregoing, the undersigned HEREBY RECOMMENDS that:

24  1.  The record be expanded and an evidentiary hearing be held on Petitioner's ineffective

25    assistance of counsel claim for failure to file a notice of appeal; and

---

[9] The Court "may direct the parties to expand the record by submitting additional materials relating to the petition," such as "letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge," and affidavits. Rule 7(a)–(b), Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"), 28 U.S.C foll. § 2254. "[T]he party against whom the additional materials are offered" must have an opportunity to admit or deny their correctness. Habeas Rule 7(c).

1    2.   The remaining claims for relief in the petition for writ of habeas corpus be DENIED.

2           This Findings and Recommendation is submitted to the assigned United States District

3    Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

4    Rules of Practice for the United States District Court, Eastern District of California. Within

5    **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

6    written objections with the court and serve a copy on all parties. Such a document should be

7    captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

8    objections shall be served and filed within fourteen (14) days after service of the objections. The

9    assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

10   § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time

11   may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834,

12   839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

13

14   IT IS SO ORDERED.

15   Dated:   **December 21, 2021**

                                        _____
16                                       UNITED STATES MAGISTRATE JUDGE